IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Alicia H.,[1] | ) | C/A No.: 1:25-13111-RMG-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **REPORT AND** |
| Frank Bisignano, Commissioner of | ) | **RECOMMENDATION** |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the undersigned denies Plaintiff's motion to expedite an award of

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

benefits, [ECF No. 29], and recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On December 13, 2023, Plaintiff protectively filed an application for DIB in which she alleged her disability began on August 1, 2018. Tr. at 192–98. Her application was denied initially and upon reconsideration. Tr. at 96–100, 103–06. On June 4, 2025, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Colin Fritz. Tr. at 38–59 (Hr'g Tr.). The ALJ issued an unfavorable decision on July 2, 2025, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 19–37. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 5–11. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on October 24, 2025. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 48 years old at the time of the hearing. Tr. at 42. She completed high school. Tr. at 53. She has no past relevant work ("PRW"). Tr.

at 55. She alleges she has been unable to work since August 1, 2018.[2] Tr. at 22.

      2.     Medical History

      a.     Evidence Submitted Prior to the ALJ's Decision

On August 28, 2023, Plaintiff presented to the emergency room ("ER") at Pelham Medical Center ("PMC"), after losing her balance and falling into a dresser. Tr. at 395. She reported dizziness, pain in her forehead and neck, and a recent increase in falls after an initial fall on July 20 and a second fall on August 20. Tr. at 395–96. Her blood pressure was elevated at 156/106 mmHg. Tr. at 400. She described skin numbness, dropping items, bilateral hand swelling, and a burning sensation in her bilateral hands and the back of her legs. Tr. at 396. Trevor Slone, D.O., ordered computed tomography ("CT") scans of Plaintiff's head, cervical spine, and chest, abdomen, and pelvis that showed no acute findings. Tr. at 398–99. He recorded normal findings on physical exam, aside from "[p]erhaps slight dysesthesias to the hands and legs." *Id.* He ordered several injections, prescribed Flexeril 10 mg and a Medrol Dosepack, and recommended follow up with a spinal specialist and a neurosurgeon. Tr. at 399–400.

---

[2] Although Plaintiff alleges her disability began on August 1, 2018, the record contains no medical evidence for the period prior to August 28, 2023, and Plaintiff stated she last worked on October 24, 2023, albeit not performing work that would be considered substantial gainful activity. Tr. at 42, 44.

Plaintiff was seen in the ER at PMC on October 15, 2023. Tr. at 390. She reported falling an additional 10–15 times since she fell and lost consciousness in July. *Id.* She endorsed burning pain in her back and hands, loss of balance, and urinary incontinence that occurred once a week. *Id.* Her blood pressure was elevated at 180/151 mmHg. Tr. at 390. Benjamin R. Wagner, M.D., noted lumbar tenderness, but otherwise normal findings on exam, including 5/5 strength to the bilateral upper and lower extremities, no dysmetria, no ataxia, and steady gait. Tr. at 390–91. He diagnosed chronic midline low back pain without sciatica, paresthesia, intermittent urinary incontinence, and ataxia after head trauma and ordered magnetic resonance imaging ("MRI") of Plaintiff's brain and cervical, thoracic, and lumbar spine. Tr. at 391, 393.

On October 18, 2023, an MRI of Plaintiff's brain showed no acute infarction and trace mastoid effusions that might be present with mastoiditis in the appropriate clinical setting. Tr. at 378. An MRI of Plaintiff's lumbar spine revealed:

> IMPRESSION: 1. Post surgery changes in L4–L5 with left-sided facetectomy, possible discectomy. Mild central canal narrowing. Bilateral mild foraminal stenosis. 2. DDD and some facet arthropathy changes elsewhere from L2–L3 to L5–S1. Probably an element of congenital short pedicles as well. Contributes to overall mild central canal narrowing in the lumbar spine with mildly prominent stenosis at L3–L4. 3. Mild prominence of a shallow protrusion on the RIGHT at L2–L3. Some abutment of the exiting right L2 nerve root.

4

Tr. at 378–79.

On October 25, 2023, an MRI of Plaintiff's cervical spine showed the following:

> **IMPRESSION**: 1. Multilevel advanced for age spinal canal stenoses, which may occur on the basis of congenitally short pedicles. This is worst at C5–6 where there is a broad-based disc bulge with superimposed central disc extrusion resulting in severe spinal canal stenosis, cord impingement, and intramedullary cord signal change. Given volume loss, this is favored to represent cord myelomalacia, although cord edema is not excluded. 2. Left-sided 1.5 cm thyroid nodule warrants dedicated sonographic evaluation per TI-RADS size criteria.

Tr. at 377–78.

Plaintiff presented to the ER at PMC on October 26, 2023, for burning pain in her bilateral hands, poor coordination, and multiple falls over the prior months. Tr. at 385. Her blood pressure was elevated at 183/108 mmHg. Tr. at 386. Marykate R. Hagel, M.D. ("Dr. Hagel"), recorded normal findings on physical exam. Tr. at 386–87. She ordered a Decadron injection and a Medrol Dosepack. Tr. at 387.

On October 30, 2023, Plaintiff presented to neurosurgeon Christie B. Mina ("Dr. Mina") for evaluation of painful, aching neck pain she rated as a 10. Tr. at 343. She described burning paresthesia throughout her bilateral upper and lower extremities that occurred primarily in her bilateral hands, lower back, anterior legs, and the plantar surfaces of her bilateral feet. *Id.*

She noted the problems had begun on July 20, after she steeped into a large hole and fell, and had been exacerbated by a similar fall on August 20. *Id.* She endorsed often feeling as if "everything is on fire," no longer being able to roller skate, difficulty ambulating at times, multiple falls, difficulty with dexterity in her bilateral hands, and frequently dropping items. Tr. at 344. Dr. Mina observed Plaintiff to demonstrate: motor pain limited secondary to burning sensation to touch; 5/5 strength throughout the bilateral upper and lower extremities; mild hyperreflexivity bilaterally at biceps, brachioradialis, patellar, and Achilles; hypersensitivity at hands, forearms, and lower legs; positive bilateral Hoffman's sign; positive bilateral clonus; spastic gait; positive Romberg; nontenderness to palpation of the cervical spine; and general myelopathy on exam. Tr. at 345. She reviewed imaging and noted the MRI of Plaintiff's cervical spine showed a loss of the cervical lordosis and stenosis from C3 to the C6–7 disc space, most severe at C5–6, where there was cord compression and early myelomalacia. *Id.* She assessed stenosis of the cervical spine with myelopathy. *Id.* Dr. Mina concluded the only viable treatment option was surgery that would involve a C3–6 open total laminectomy and C3–7 posterior fusion with local autograft and infinity instrumentation. Tr. at 346.

On November 1, 2023, Plaintiff returned to Dr. Mina to discuss surgery. Tr. at 340. She was 5'6" tall and weighed 253 pounds. Tr. at 342. Dr.

6

Mina recorded the same observations as on the prior exam and assessed stenosis of the cervical spine with myelopathy. Tr. at 341. She indicated she had answered all of Plaintiff's questions and Plaintiff was ready to proceed with surgery. Tr. at 341–42.

Plaintiff returned to the ER at PMC on November 4, 2023, for a sore throat, worsened neck pain, and continued loss of bladder control. Tr. at 375. Mark Andrew Ellis, M.D. ("Dr. Ellis"), recorded normal findings on physical exam. Tr. at 376–77. X-rays showed stable appearance of mildly-increased degenerative disc disease ("DDD") at C5–6 and no acute abnormality. Tr. at 377. Dr. Ellis consulted with Dr. Mina, who indicated Plaintiff's sore throat was unrelated to her cervical lesion. Tr. at 379. He ordered a Toradol injection and noted Plaintiff was walking and swallowing well after receiving it. *Id.*

Plaintiff presented to PMC for pre-admission testing on November 8, 2023. Tr. at 349. Her blood pressure was elevated at 162/117 and 178/108 mmHg. *Id.* Nurse Jessica D. Crawford ("Nurse Crawfold") contacted Dr. Garrett to review Plaintiff's blood pressure readings. *Id.* Dr. Garrett noted Plaintiff's electrocardiogram ("EKG") was "okay," but that she would need preoperative clearance and medical optimization for her blood pressure before proceeding with surgery. *Id.* Nurse Crawford subsequently notified Dr. Mina's office of Dr. Garrett's message. *Id.*

Plaintiff presented to the ER at PMC on November 29, 2023. Tr. at 369. She sought surgical clearance and reported neck pain and a minor amount of blood in her mouth in the mornings. *Id.* Elizabeth Sprott Atkinson, M.D., informed Plaintiff that she could not obtain preoperative clearance through the ER and noted there was no active bleeding in Plaintiff's mouth. *Id.* She recorded Plaintiff's blood pressure as elevated at 181/106 mmHg and noted full range of motion ("ROM") of the neck, no deformities of the back, and full ROM in all extremities on physical exam. Tr. at 370. She instructed Plaintiff to follow up with her primary care physician for an order for preoperative clearance tests. Tr. at 371.

Also on November 29, 2023, medical assistant Emily Parks ("Ms. Parks") noted that Dr. Mina stated that due to Plaintiff's uncontrolled blood pressure, she would need to be directly admitted to the hospital two days prior to surgery for administration of medication to manage her blood pressure before and after surgery. Tr. at 372.

Plaintiff underwent a transthoracic echocardiogram on December 8, 2023, at Emory University Hospital Midtown. Tr. at 444–47. It showed: normal size and systolic function of the right ventricle; normal systolic function of the left ventricle, estimated ejection fraction of 50–55%, and grade

8

I diastolic dysfunction[3] with normal left ventricular filling pressure; normal size of the left and right atrium; normal right atrial pressure; normal mitral valve structure with no restricted motion or mitral valve regurgitation; no aortic valve regurgitation or stenosis; normal pulmonic valve structure with no regurgitation; normal sinus of Valsalva and ascending aorta size, and no pericardial effusion. *Id.*

On February 24, 2024, chiropractor Zachary Ayala ("Dr. Ayala") provided a statement noting Plaintiff had been unable to perform job duties since January 2024. Tr. at 455. He specified restrictions of: "No lifting anything more than 10 lbs; Must have immediate bathroom access at all times due to loss of bowel/bladder control." *Id.* In response to a question as to which activities of daily living ("ADLs") Plaintiff was unable to perform, he wrote: "Unable to contain bowel and bladder function, Walking, Lifting, Bending, Elevated stress in any environment, Driving." *Id.* Dr. Ayala also provided an undated summary to Disability Determination Services. Tr. at 461–62. He noted Plaintiff had presented to his office in January 2024, complaining of burning, numbness, and tingling in her upper extremities, difficulties in her lower extremities with muscle strength, stability, and

---

[3] Grade I diastolic dysfunction represents only slight impairment. *See* Diastolic Dysfunction, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/23434-diastolic-dysfunction (last visited Mar. 11, 2026). It is generally caused by untreated hypertension and can be treated through lifestyle modifications and medications. *Id.*

ability to walk, incontinence, and digestive health issues. Tr. at 461. He stated he had performed testing that showed nervous system dysfunction and loss in ROM suggesting spinal dysfunction congruent with Plaintiff's neurological findings. *Id.* He noted treatment had improved Plaintiff's walking, neck pain, discomfort, and ability to control her incontinence. *Id.* However, he indicated Plaintiff continued to have significant difficulty with standing and walking without tripping or needing to rest, as well as postural issues that may prevent her from reaching, stooping, and handling products effectively. Tr. at 461–62. He advised that Plaintiff should "not be placed in any type of strenuous workplace environment that might require excessive standing, walking or heavy lifting." Tr. at 462. He stated Plaintiff continued to have problems with urinary and bowel incontinence, such that she should "not work in an environment that may require any sanitized or sterile environment." *Id.* He indicated Plaintiff's physical symptoms were exacerbated by emotional distress and discomfort such that she should "avoid being placed in high stress situations that require prolonged mental and emotional situations that don't provide breaks." *Id.* Dr. Ayalla provided notes reflecting Plaintiff's treatment on January 24, 25, 29, and 31, February 1, 5, 7, 8, 12, 14, 15, 19, 21, 22, 26, and 28, March 4, 6, 7, 11, 13, 14, 18, 21, 25, and 28, and April 1, 4, 8, 11, and 15, 2024. Tr. at 472–94.

10

Plaintiff met with Ms. Parks on February 27, 2024, as she was upset that Dr. Mina had completed an AFLAC form that stated she could return to work. Tr. at 500. Ms. Parks explained to Plaintiff that Dr. Mina wanted to proceed with surgery, but could not do so unless Plaintiff obtained cardiac clearance to undergo anesthesia. *Id.* She indicated that Plaintiff would need to follow up with her treating provider for an updated work status. *Id.* She noted Plaintiff reported worsened problems with urinating and uncontrolled bowel movements and requested a letter stating that her case was critical and that she would die without surgery. *Id.* Ms. Parks informed Plaintiff that she could not provide such a letter, as Dr. Mina did not document that her condition was life-threatening. *Id.* She further noted that Dr. Mina had provided Plaintiff with a collar to wear at all times and that Plaintiff was not wearing the collar during their meeting. *Id.*

On May 2, 2024, Ms. Parks included a note in Plaintiff's chart indicating she had returned Plaintiff's call. Tr. at 500. Plaintiff reported her pain had changed after a fall on the prior day and requested that Dr. Mina order an updated MRI of her cervical spine. *Id.* Ms. Parks offered Plaintiff an appointment that she declined and indicated she would review Plaintiff's request for an updated MRI with Dr. Mina. *Id.*

Ms. Parks included an updated note on May 7, 2024, indicating she had spoken to Dr. Mina, who had indicated an updated MRI would only be

authorized if Plaintiff were proceeding with surgery, but that Plaintiff should return to Emory for the surgery based on the complexity of her case and her need for cardiac clearance. *Id.* Ms. Parks attempted to contact Plaintiff, but Plaintiff did not answer and Ms. Parks was unable to leave a message. *Id.*

Ms. Parks spoke with Plaintiff on May 13, 2024, and conveyed Dr. Mina's message. *Id.* Plaintiff reported she had lost her insurance and had no job or income. *Id.* Ms. Parks indicated she would send a referral for neck surgery to Emory and that Plaintiff should follow up with Emory about her heart. *Id.*

On July 17, 2024, state agency medical consultant and obstetrician William Hopkins, M.D. ("Dr. Hopkins"), reviewed the record and assessed Plaintiff's physical residual functional capacity ("RFC") as follows: occasionally lift and or carry 10 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of two hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; and avoid concentrated exposure to hazards. Tr. at 85–87. A second state agency medical consultant, surgeon Lindsey Crumlin, M.D. ("Dr. Crumlin"), reviewed the record and provided the same physical RFC for Plaintiff on August 15, 2024. *Compare* Tr. at 85–87, *with* Tr. at 92–94.

On August 13, 2024, Plaintiff contacted medical assistant Cherelle Moody ("Ms. Moody") in Dr. Mina's office. Tr. at 570. She was upset that she had been denied disability benefits and accused the office of failing to submit her records. *Id.* Ms. Moody explained to Plaintiff that all her records had been sent. *Id.* Plaintiff subsequently requested a letter stating she was terminally ill and had a heart issue. *Id.* Ms. Moody explained that Dr. Mina's office had not provided that diagnosis and that she would need to follow up with Emory for a letter. *Id.*

Ms. Parks spoke with Plaintiff on August 16, 2024. Tr. at 570. Plaintiff complained of urinary incontinence and foaming urine. *Id.* Ms. Parks encouraged Plaintiff to pursue her husband's insurance and explained that she would need to establish treatment with a local primary care provider to address her urinary issues, as well as a cardiologist. Tr. at 570.

Plaintiff presented to the ER at PMC on October 29, 2024, with a complaint of an insect bite to her left second digit two days prior. Tr. at 566. She reported blurred vision and a rash to her neck, bilateral eyes, and upper and lower extremities. *Id.* She was unsure whether these symptoms were related to the insect bite or exposure to poison ivy. *Id.* Her blood pressure was elevated at 163/116 mmHg. Tr. at 567. Physician assistant Phillip Leonard ("PA Leonard") recorded normal findings on physical exam, aside from a "1 x 1 cm raised erythematous and indurated area with central scab" over the

proximal interphalangeal joint of the left index finger and a "[d]iffuse, indurated and coalescing raised rash with intermittent pustules to left forearm, left side of neck intermittently over left upper trunk." Tr. at 567–68. He assessed contact dermatitis and an infected insect bite and ordered Keflex, Clobetasol cream, Prednisone, and a Decadron injection. Tr. at 568.

b.    Evidence Submitted to the Appeals Council

Plaintiff presented to Cara Douglass, D.O., to establish treatment on May 9, 2025. Tr. at 66. She reported overall fatigue, imbalance, having lost over 80 pounds, and a history of urinary incontinence since 2023 that rendered her unable to work. *Id.* She said she had been following Dr. Mina for cervical myelopathy and cardiology for a possible birth defect and was awaiting cardiac clearance to undergo spinal surgery. *Id.* This record appears incomplete, as it contains only Plaintiff's subjective allegations.

Plaintiff presented to nurse practitioner Amy Murray ("NP Murray") with complaints of urinary and bowel incontinence on May 27, 2025. Tr. at 75. NP Murray noted Plaintiff stated she was not a candidate for surgery secondary to heart disease, although an echocardiogram with bubble study performed the prior week at Bon Secours had been essentially normal. *Id.* Plaintiff indicated she had stopped seeing Dr. Mina in 2023 to pursue treatment with a holistic provider and chiropractor. *Id.* She felt that treatment with the chiropractor had improved her ability to walk, but had

worsened her incontinence. *Id.* She noted she set a timer so she would void her bladder every two hours, as she did not feel the urge to void or defecate. *Id.* NP Murray recorded no abnormalities on physical exam. Tr. at 76. She assessed urinary incontinence without sensory awareness, neurogenic bladder, and cervical myelopathy based on Plaintiff's reports. Tr. at 76–77. She stated urinalysis was normal, aside from glucosuria. Tr. at 77. She provided samples of Gemtesa for overactive bladder and ordered a urodynamics study to evaluate for neurogenic bladder. *Id.*

Plaintiff presented to Aaron Curtis MacDonald, M.D. ("Dr. MacDonald"), at AnMed Spine & Neurosurgery on July 30, 2025. Tr. at 71. She weighed 201 pounds. Tr. at 72. Dr. MacDonald noted that Plaintiff had undergone a cardiac evaluation on May 9, 2025, during which Dr. Wheeler had "indicate[d] a relatively normal cardiac function with ejection fractions of 50 to 55% range" with "mild diastolic dysfunction with normal left atrial pressure and no hemodynamically significant valve disease" and "no limitations from a cardiac standpoint based on his evaluation." Tr. at 71. He noted Plaintiff's reports of numbness and tingling in her hands with burning dysesthesias, difficulty appreciating temperature and pain, and increased urinary and fecal incontinence. *Id.* Dr. MacDonald recorded the following findings on exam: 5/5 motor strength in each muscle group of both upper and lower extremities; brisk deep tendon reflexes throughout; bilateral Hoffman

15

sign; 2 beat clonus in both feet; no Babinksi; short gait; and stiff, possibly spastic, stepping with the legs. *Id.* He stated: "It is difficult for patients with spondylotic myelopathy with compressive spinal cord issues to maintain gainful employment both from a work load expectation and general mobility." *Id.* He ordered updated imaging. *Id.* He indicated Plaintiff would need cardiac clearance to proceed with surgery, although Plaintiff indicated she was no longer considering surgery based on what she had been told by cardiology. *Id.*

Plaintiff underwent a urodynamics study for urge incontinence without sensory awareness, neurogenic bladder, and sugar in the urine on August 11, 2025. Tr. at 62–65. Urinalysis revealed cloudy urine, elevated glucose of 500 mg/dL, and trace urine ketones. Tr. at 64–65. The notes described the procedure and indicated Plaintiff was to follow up to discuss the results with a doctor, as the study would be scanned into her chart after a physician signed off on the report. *Id.*

On August 13, 2025, an MRI of Plaintiff's lumbar spine showed similar-appearing mild and mild-to-moderate multilevel lumbar stenosis and mild superimposed diffuse spinal canal stenosis secondary to short pedicles. Tr. at 67–68. An MRI of her cervical spine indicated similar-appearing multilevel cervical stenosis with superimposed congenitally-short pedicles that was

most pronounced at C5–6 with volume loss concerning for compressive myomalacia. Tr. at 69.

    C.    The Administrative Proceedings

        1.    The Administrative Hearing

            a.    Plaintiff's Testimony

At the hearing on June 4, 2025, Plaintiff testified she lived in a house with her husband, dog, and cat. Tr. at 43. She confirmed she had a driver's license, although her husband drove her to the hearing. *Id.* She indicated she had health insurance through her husband's employer. *Id.*

Plaintiff stated she last worked at Burger King on October 24, 2023. Tr. at 44. She said she had worked at two different Burger King restaurants, as a training manager at the Piedmont location from 2021 to 2023 and at the Williamston location from 2018 to 2021. *Id.* She indicated she had previously worked at Arby's from 2015 until 2018. Tr. at 45.

Plaintiff testified problems with bowel and bladder control prevented her from working. *Id.* She said she experienced incontinence because she could not feel urgency to use the restroom. *Id.* She stated she had fallen often, felt a burning sensation all over her body, and could not feel the outside temperature and bug bites on her skin. *Id.* She indicated Dr. MacDonald had operated on her lumbar spine in 2006. *Id.*

Plaintiff explained that she had visited Dr. Mina for evaluation of her neck after she fell in a hole while cutting her grass and briefly lost consciousness in August 2023. Tr. at 45, 51. She stated her neighbor assisted her after she fell and she visited the ER with complaints of numbness, tingling, and burning in her hands and burning in her leg. Tr. at 46. She noted she continued to work until October 2023, although she sustained several falls, dropped items, forgot orders, and was incontinent. *Id.*

Plaintiff testified she noticed difficulty standing and remembering after the August 2023 fall. *Id.* She said she experienced a burning sensation after standing for a brief time. *Id.* She explained that she adjusted herself while sitting and felt dizzy when she attempted to rise from a seated position. *Id.* She stated she could only walk a few steps at a time and had fallen while walking in her house. *Id.* She said she could no longer shower unless her husband was home to assist her. Tr. at 47–48. She indicated she no longer wore jeans because she could not pull them down fast enough to use the restroom. Tr. at 48.

Plaintiff described tightness, pain, and burning in her hands. *Id.* She denied that the problems she described were present prior to her fall in August 2023. *Id.* She said she had burning and stabbing pain in her neck while sitting, reading, and looking at her phone. *Id.* She stated her arms felt

weak and she had to rest them often. *Id.* She noted her legs and toes would lock up, causing her to fall. Tr. at 49.

Plaintiff testified she had previously competed as a roller skater and had taught her granddaughter to skate, but could no longer skate after she fell in August 2023. *Id.* She stated she had previously walked six miles on the track, but was no longer able to do so. Tr. at 52. She said she typically went to bed around 9:00 PM, although she awoke during the night and required her husband's help to go to the restroom. *Id.* She explained that she would wake, lie in bed, and speak with her husband before he left for work at 7:00 AM. Tr. at 50. She stated she had stopped driving as frequently due to her incontinence. *Id.* She said she spent most days organizing things in her house, but did not cook, wash dishes, clean, or do yardwork. Tr. at 50–51. She indicated she no longer babysat her grandchildren, although she would sometimes meet her daughter and her grandchildren at the library to watch her grandchildren play. Tr. at 51. She estimated she could lift only a pound or two. *Id.* She said she had to hold on to both sides of the porch railing for stability as she entered and exited her home. Tr. at 52. She denied being able to reach overhead due to pain in her arms and neck. *Id.*

Plaintiff denied taking any prescription medications. Tr. at 53. She stated she used topical Biofreeze gel on her back and shoulders. *Id.* She said she could not return to her past work because of incontinence, difficulty

19

grasping and feeling items, poor memory, and difficulty standing and walking. *Id.* She stated she did not wear incontinence diapers or pads because they were ineffective. Tr. at 54.

b.    Vocational Expert Testimony

Vocational Expert ("VE") David Vandergoot reviewed the record and testified at the hearing. Tr. at 55–59. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform work at the sedentary exertional level requiring no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; frequent bilateral reaching, handling, and fingering; occasional exposure to hazards associated with unprotected heights and dangerous machinery; understanding, remembering, and carrying out simple tasks; and no work requiring a specific production-rate pace, such as team-dependent assembly line work. Tr. at 56. The VE testified that the hypothetical individual would be able to perform sedentary work with a specific vocational preparation ("SVP") of 2, as an order clerk, *Dictionary of Occupational Titles* ("*DOT*") No. 209.567-014, a charge account clerk, *DOT* No. 205.367-014, and a type copy examiner, *DOT* No. 979.687-026, with 10,900, 28,100, and 9,900 positions in the national economy, respectively. *Id.*

For a second hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who was limited as described in

the first question, except that she could perform only occasional bilateral reaching, fingering, and handling and would be off task an average of 25% of the workday, beyond customary work breaks. Tr. at 56–57. The ALJ asked the VE if there would be any work available for the individual described. Tr. at 57. The VE testified there would be no work. *Id.*

### 2.    The ALJ's Findings

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2028.
2.    The claimant has not engaged in substantial gainful activity since August 1, 2018, the alleged onset date (20 CFR 404.1571 *et seq.*).
3.    The claimant has the following severe impairments: Cervical Stenosis; Lumbar Degenerative Disc Disease status post L4–L5 Left-Sided Facetectomy; Hypertension; and Obesity (20 CFR 404.1520(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).
5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can never climb ladders, ropes and scaffolds; she can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; she can perform bilateral reaching, handling, and fingering frequently; she can occasionally be exposed to hazards associated with unprotected dangerous machinery or unprotected heights; she can understand, remember, and carry out simple instructions and tasks; and she cannot perform work requiring a specific production rate pace (such as team-dependent assembly line work).
6.    The claimant has no past relevant work (20 CFR 404.1565).

21

7.  The claimant was born on May 30, 1977, and was 41 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has at least a high school education (20 CFR 404.1564).

9.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 1, 2018, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 24–31.

II.  Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)  the ALJ failed to adequately consider her cardiac impairments;

2)  the ALJ improperly evaluated the disorders of her spine under Listings 1.15 and 1.16;

3)  the ALJ did not consider evidence that she was terminally ill and likely to die within two years; and

4)  the ALJ ignored her incontinence and the frequency of her bathroom use in concluding she was able to perform jobs.[4]

---

[4] Plaintiff also claims she was improperly referred to as a male. *See* ECF No. 26 at 7, 9, 10. The record contains a report of contact confirming that there were references to Plaintiff being both male and female and that contact was made with the field office to correct the error. Tr. at 159. It appears this error was resolved, as review of the ALJ's decision and the transcript reveals no references to Plaintiff as a male. *See* Tr. at 22–32, 38–59. Nevertheless, whether Plaintiff was referred to as a male or a female is not relevant to the issues of whether the ALJ applied the proper legal standard and whether substantial evidence supports the ALJ's disability determination.

She subsequently filed a motion requesting the court expedite an award of benefits. [ECF No. 29].

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[5] (4) whether such impairment prevents claimant from performing PRW;[6] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §

[5] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).
[6] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied

the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Cardiac Impairments

Plaintiff alleges she has "Four holes bleeding in Left ventricle confirmed by bubble test holes on screen bleeding out (5/20/25), however was found earlier than that date (stroke 10/9/17 on Job Arby's!) Verified Anmed)." [ECF No. 26 at 5]. She claims her heart "cannot be patched or switched out." *Id.* The undersigned construes this as an argument that the ALJ did not adequately consider Plaintiff's severe cardiac impairment.

The Commissioner maintains the evidence of record does not support Plaintiff's allegations regarding cardiac impairment and functioning. [ECF No. 27 at 1]. He cites the ALJ's reference to a December 2023 transthoracic echocardiogram that showed no abnormalities in the structure or function of Plaintiff's heart. *Id.* at 13 (citing Tr. 25, 444). He further explains that the records Plaintiff submitted to the Appeals Council after the ALJ's decision confirmed that an echocardiogram with bubble study was "essentially normal" and that cardiologist Dr. Wheeler found "relatively normal cardiac function," as "he saw no limitations from a cardiac standpoint based on his evaluation." *Id.* (citing Tr. 71, 75). He acknowledges Plaintiff's reports to her treating providers in May 2024 that a cardiologist at Emory University did not clear her for surgery due to holes in her heart, but points out there are no medical records confirming her reports. *Id.* (citing Tr. 500-01). He further

27

indicates the Social Security Administration ("SSA") requested records from Emory, but received a response in June 2024 indicating no records were available for the dates of treatment requested (August 2017 to the present). *Id.* (citing Tr. 516–17, 520). He contends the ALJ appropriately considered Plaintiff's hypertension as a severe impairment. *Id.*

An ALJ must consider the severity of the claimant's impairments at step two. 20 C.F.R. § 416.920(c). A severe impairment "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.920(c). "An impairment or combination of impairments is found 'not severe' and a finding of 'not disabled' is made at [step two] when the medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, and work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities)." SSR 85-28.

Generally, an ALJ's recognition of at least one severe impairment at step two ensures that he will proceed to subsequent steps. Therefore, this court has found no reversible error in ALJs' erroneous assessments of impairments as non-severe, provided the impairments were considered at subsequent steps. *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580

28

(D.S.C. 2010) (collecting cases); *Singleton v. Astrue*, C/A No. 9:08-1982-CMC, 2009 WL 1942191, at *3 (D.S.C. July 2, 2009).

Here, the ALJ did not fail to consider Plaintiff's cardiac impairments at step two, as he specifically acknowledged hypertension among her severe impairments. *See* Tr. at 25. The record supports a diagnosis of hypertension, as confirmed by several providers, multiple blood pressure checks, and a transthoracic echocardiogram. However, the ALJ explained that it did not support the existence of any other medically-determinable cardiac impairment or stroke:

> The claimant also alleges heart murmur and stroke related impairments; however, there is no objective evidence from a medically acceptable source indicating an etiology supporting these complaints. Notably, the claimant had a normal TTE at Exhibit 8F and a normal MRI of the [b]rain and head CT at Exhibit 5F, 58. An impairment must be established by objective medical evidence from an acceptable medical source. Objective medical evidence means signs and/or laboratory findings. Signs are one or more anatomical, physiological, or psychological abnormalities that are observable, apart from the claimant's statements (description of symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Symptoms alone cannot establish the existence of a medically determinable impairment. Accordingly, the undersigned finds these alleged conditions to be nonmedically determinable impairments.

*Id.*

The undersigned has scoured the record and found nothing other than Plaintiff's statements to support a history of stroke or bleeding holes in her heart. Plaintiff claims she suffered a stroke in October 2017, but the record

29

lacks medical evidence prior to August 2023, and none of the medical records confirm her purported history of stroke. Plaintiff references a May 2025 bubble test as confirming her allegations regarding holes in her heart. While the bubble test is absent from the record, a May 27, 2025 note from NP Murray refutes Plaintiff's allegations regarding its results, as it states the echocardiogram with bubble study performed the prior week at Bon Secours was essentially normal. Tr. at 75. Plaintiff's allegations are further refuted by Dr. MacDonald's July 30, 2025 treatment note in which he documented that a May 9, 2025 cardiac evaluation with Dr. Wheeler had "indicate[d] a relatively normal cardiac function with ejection fractions of 50 to 55% range" with "mild diastolic dysfunction with normal left atrial pressure and no hemodynamically significant valve disease" and "no limitations from a cardiac standpoint based on his evaluation." Tr. at 71. While these records confirm grade I diastolic dysfunction, likely attributable to uncontrolled hypertension, they show no more significant cardiac impairment.

Plaintiff alludes to missing records from Emory Hospital that purportedly support her claims, but the SSA requested and received what appears to be all the records from the Emory University hospitals for the relevant period. *See* Tr. at 301 (February 18, 2025 Report of Contact in which Plaintiff reported records were needed from Emory Hospital for November through December 2023); Tr. at 442–54 (indicating records were requested

from Emory University Hospital Midtown on July 29, 2024, for the period from November 1, 2022 to the present and containing records for December 8, 2023); Tr. at 516–20 (indicating records were requested from Emory University Hospital on June 19, 2024, for the period from "08/01/2017 to Present" and that there was "no treatment at this facility for the dates of service you requested"). Thus, Plaintiff's argument that the ALJ erred in failing to obtain records that would support greater cardiac impairment is unavailing, as the SSA requested all relevant records from Emory University's hospitals during the relevant period and they did not confirm the cardiac impairments Plaintiff alleges.

Not only did the ALJ consider Plaintiff's hypertension at step two, he considered it in subsequent steps. He found Plaintiff's hypertension did not meet a listing, as there was "no evidence in the medical file of a specific body system so affected as to meet a listing in the instant case." Tr. at 25. He accommodated the impairment in the RFC assessment, explaining:

> With regard to the claimant's hypertension, the undersigned has found it severe and considered it in limiting claimant to sedentary work with postural, manipulative, and environmental limitations. However, the claimant is not limited to the degree alleged. Despite the claimant having high blood pressure readings in the record, she continually denied experiencing a cough, shortness of breath, chest pain, abdominal pain, headaches or blurred vision (5F, 31 and 35; 17F, 6).

Tr. at 29.

31

Given a lack of evidence to support additional cardiac impairment, the ALJ's explanation as to how he addressed Plaintiff's hypertension in the RFC assessment, and a lack of evidence to suggest hypertension or any other cardiac impairment imposed additional functional limitations, the undersigned recommends the court find the ALJ did not err in evaluating Plaintiff's cardiac impairments.

2.      Listings 1.15 and 1.16

Plaintiff appears to allege her spinal impairments meet Listings 1.15 and 1.16. [ECF No. 26 at 1]. She writes: "Told walker—wheelchair." *Id.*

The Commissioner argues the ALJ reasonably concluded that Plaintiff's impairments did not meet a listing. [ECF No. 27 at 12]. He maintains the ALJ was not required to address every element in Listings 1.15 and 1.16 because he explained that Plaintiff's impairment did not meet paragraph D of the listings. *Id.* at 14. He maintains the record does not support Plaintiff's claims that she required a walker or wheelchair prior to the ALJ's decision. *Id.* He further contends there is no evidence to show Plaintiff is unable to use her upper extremities for fine or gross movements. *Id.*

Step three of the sequential evaluation process requires the ALJ to identify relevant listings and compare their medical criteria with the symptoms, signs, and laboratory findings of the claimant's impairments, as reflected in the medical evidence. *Cook v. Heckler*, 783 F.3d 1168, 1173 (4th

Cir. 1986); 20 C.F.R. § 404.1508. In general, "[f]or a claimant to show that his impairment matches a listing, it must meet all the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). The claimant bears the burden of proving her impairment meets a listing. *See Kellough v. Heckler*, 785 F.2d 1147, 1152 (4th Cir. 1986).

Listing 1.15 addresses disorders of the skeletal spine resulting in compromise of a nerve root. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 1.15. For a claimant's impairment to meet the listing, she must exhibit the signs and symptoms set forth in paragraphs A, B, C, and D, which include:

A. Neuro-anatomic (radicular) distribution of one or more of the following *symptoms* consistent with compromise of the affected nerve root(s):
1. Pain; or
2. Paresthesia; or
3. Muscle fatigue.

AND

B. Radicular distribution of neurological *signs* present during physical examination (see 1.00C2) or on a diagnostic test (see 1.00C3) and evidenced by 1, 2, and either 3 or 4:
1. Muscle weakness; and
2. Sign(s) of nerve root irritation, tension, or compression, consistent with compromise of the affected nerve root (see 1.00F2); and
3. Sensory changes evidenced by:
   a. Decreased sensation; or
   b. Sensory nerve deficit (abnormal sensory nerve latency) on electrodiagnostic testing; *or*
4. Decreased deep tendon reflexes.

AND

C. Findings on imaging (see 1.00C3) consistent with compromise of a nerve root(s) in the cervical or lumbosacral spine.

33

AND
D.   Impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months, and medical documentation of at least *one* of the following:
   1.   A documented medical need (see 1.00C6a) for a walker, bilateral canes, or bilateral crutches (see 1.00C6d) or a wheeled and seated mobility device involving the use of both hands (see 1.00C6e(i)); or
   2.   An inability to use *one* upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements (see 1.00E4), *and* a documented medical need (see 1.00C6a) for a one-handed, hand-held assistive device (see 1.00C6d) that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand (see 1.00C6e(ii)); or
   3.   An inability to use *both* upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements (see 1.00E4).

*Id.* (emphasis in original).

Listing 1.16 requires lumbar spinal stenosis resulting in compromise of the cauda equina, as documented by the following criteria listed in paragraphs A, B, C, and D:

A.   Symptom(s) of neurological compromise manifested as:
   1.   Nonradicular distribution of pain in one or both lower extremities; or
   2.   Nonradicular distribution of sensory loss in one or both lower extremities; or
   3.   Neurogenic claudication.
AND
B.   Nonradicular neurological signs present during physical examination (see 1.00C2) or on a diagnostic test (see 1.00C3) and evidenced by 1 and either 2 or 3:
   1.   Muscle weakness.

       2.     Sensory changes evidenced by:
          a.     Decreased sensation; or
          b.     Sensory nerve deficit (abnormal sensory nerve latency) on electrodiagnostic testing; or
          c.     Areflexia, trophic ulceration, or bladder or bowel incontinence.

3.     Decreased deep tendon reflexes in one or both lower extremities.

AND

C.     Findings on imaging (see 1.00C3) or in an operative report (see 1.00C4) consistent with compromise of the cauda equina with lumbar spinal stenosis.

AND

D.     Impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months, and medical documentation of at least *one* of the following:

       1.     A documented medical need (see 1.00C6a) for a walker, bilateral canes, or bilateral crutches (see 1.00C6d) or a wheeled and seated mobility device involving the use of both hands (see 1.00C6e(i)); or

       2.     An inability to use *one* upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements (see 1.00E4), *and* a documented medical need (see 1.00C6a) for a one-handed, hand-held assistive device (see 1.00C6d) that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand (see 1.00C6e(ii)).

20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 1.16 (emphasis in original).

The ALJ addressed Listings 1.15 and 1.16 as follows:

The undersigned has reviewed the requirements of Listings 1.15 and 1.16 in consideration of the claimant's degenerative disc disease and cervical stenosis. However, the record does not demonstrate a medically documented need for bilateral canes or crutches or a wheeled and seated mobility device involving the use of both hands; an inability to use one upper extremity to independently initiate, sustain, and complete work-related

35

activities involving fine and gross movements in addition to a documented medical need for a one-handed, hand-held assistive device that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand; or an inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements.

Tr. at 25.

Although Plaintiff writes "Told walker—wheelchair," nothing in the record before the court suggests that she required the use of a walker or wheelchair at the time of or prior to the ALJ's decision. To the extent she is suggesting that she has been told she will eventually require use of a walker or wheelchair, a likely need for future use of an ambulatory assistive device is not sufficient to meet the listing. Plaintiff has pointed to, and the undersigned's review of the record fails to yield, no evidence that would refute the ALJ's conclusion regarding the paragraph D criteria. Because a claimant's impairment must meet the criteria in parts A, B, C, and D of both listings, it was sufficient for the ALJ to conclude Plaintiff did not meet either listing because she did not satisfy the paragraph D criteria. Therefore, the undersigned recommends the court find substantial evidence supports the ALJ's conclusion that Plaintiff's impairments did not meet Listings 1.15 and 1.16.

### 3. Terminal Illness

Plaintiff claims she is terminally ill, as allegedly certified by Dr. MacDonald, Dr. Mina, Emory Hospital, and Dr. Wheeler. *See generally* ECF No. 26. She writes: "The estimated time life left die at night while sleeping from heart bleeding to stop, or lucky at most two years, cause cut off fluid from brain to spine leading to walker, wheelchair, head fall off spine— Death!)." *Id.* at 3. She writes: "This is simple If you have all medical evidence stating death and no more medical interventions can be done award benefits for dying claimant." *Id.* at 10.

The Commissioner argues the record contains no evidence to suggest Plaintiff is terminally ill. [ECF No. 27 at 1].

"The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment *which can be expected to result in death* or has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a) (emphasis added). It is not merely sufficient that a medically-determinable impairment be expected to result in death, as it must also prevent the individual from doing any substantial gainful work activity. *See Kendrick v. Califano*, 460 F. Supp. 561, 568 (E.D. Va. 1978) ("The mere fact that an individual suffers from terminal cancer does not entitle him to disability benefits. The critical question is whether the terminally ill

37

claimant is unable to engage in substantial gainful activity because of his illness.") (citing *Price v. Richardson,* 443 F.2d 347 (5th Cir. 1971); *Fuerst v. Secretary of Health, Education and Welfare*, 354 F. Supp. 185 (S.D.N.Y.1973)). To demonstrate she suffers from a terminal illness, the claimant must present objective medical evidence from an acceptable medical source showing her impairment is expected to result in death. *See* 20 C.F.R. §§ 404.1512(a), 404.1521.

Plaintiff has failed to present objective medical evidence from an acceptable medical source showing her impairments are likely to result in death. The ALJ noted that Plaintiff requested her "treating physician put it was a critical case and without the surgery she would die; however, it was explained to her that it was not documented as life threatening." Tr. at 28.

Notes from several other providers refute Plaintiff's allegation that she is terminally ill. On August 13, 2024, Ms. Moody denied Plaintiff's request for a letter stating she was terminally ill and had a heart issue, as Dr. Mina had not provided that diagnosis. Tr. at 570. NP Murray and Dr. MacDonald subsequently noted Dr. Wheeler's exam had shown relatively normal cardiac function and no cardiac limitations. *See* Tr. at 71, 75.

In light of the foregoing, the undersigned recommends the court find substantial evidence supports the ALJ's conclusion that Plaintiff failed to demonstrate that her impairments were likely to result in death.

### 4.    Incontinence

Plaintiff claims her bowels have died and she no longer feels a sensation when she needs to use the restroom. [ECF No. 26 at 2]. She states she experiences 20 or more episodes of incontinence daily that require she shower multiple times. *Id.* at 3. She maintains her incontinence is caused by myelopathy and stenosis of her cervical spine that has caused her to lose sensation. *Id.* at 6.

The Commissioner argues the ALJ based the RFC assessment on Plaintiff's subjective allegations, her treatment history, her provider's observations, and her reports of activities. [ECF No. 27 at 15–17]. He maintains Plaintiff did not report the frequency of incontinence she alleges in her brief to any provider and failed to seek treatment for incontinence during the relevant period. *Id.* at 18.

"[A]n ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. § 404.1529(b)). If the ALJ concludes at the first step that the claimant's impairment could reasonably produce the symptoms she alleges, he proceeds to the second step, which requires him to "evaluate the intensity, persistence,

39

and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform basic work activities." *Id.* (citing 20 C.F.R. § 404.1529(c)).

The ALJ must consider at the second step "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." 20 C.F.R. § 404.1529(c)(4). This requires the ALJ to review "statements from the individual, medical sources, and any other sources that might have information about the claimant's symptoms, including agency personnel," as well as the following factors, where applicable: (1) the claimant's ADLs; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating or aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures the claimant uses or has used to relieve pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2017 WL 5180304, at *6.

The ALJ must explain which of the claimant's alleged symptoms he considered "consistent or inconsistent with the evidence in [the] record and

how [his] evaluation of the individual's symptoms led to [his] conclusions. SSR 16-3p, 2017 WL 5180304, at *8. "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* at *10.

The ALJ acknowledged Plaintiff's testimony that she was "unable to work due to issues with her bowels and having accidents." Tr. at 27. He found that her medically-determinable impairments "could reasonably be expected to cause the alleged symptoms," but found her "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *Id.* Thus, the ALJ found that Plaintiff had met the step one threshold of establishing that she had a medically-determinable impairment that could reasonably cause bowel and bladder incontinence, but that she had failed to clear the hurdle at step two.

Notwithstanding the ALJ's promise of an explanation and despite his recognition of Plaintiff's testimony, her report of intermittent urinary incontinence during an October 2023 ER visit, Tr. at 27, and her report of accidents multiple times per day during a November 2023 neurology visit, Tr. at 28, he failed to explain how the evidence failed to support restrictions in

the RFC assessment to accommodate Plaintiff's incontinence. While the ALJ explained how he evaluated the persuasiveness of Dr. Ayala's opinion, he ignored Dr. Ayala's impression that Plaintiff's incontinence would limit her ability to work. *Compare* Tr. at 30, *with* Tr. at 455 and 461–62.

The undersigned agrees with the Commissioner that the evidence before the ALJ failed to document the frequency of incontinence Plaintiff alleges or any efforts to obtain treatment for the problem, but the court cannot accept the Commissioner's post hoc arguments in lieu of the ALJ's explanation. *See Arakas v. Commissioner, Social Security Administration*, 983 F.3d 83, 109 (4th Cir. 2020); (rejecting the Commissioner's argument as "a meritless post-hoc justification") (citing *Radford* [*v. Colvin*], 734 F.3d [288,] 294 [(4th Cir. 2013)] (rejecting the Commissioner's attempt to justify the ALJ's denial of disability benefits as a post-hoc rationalization); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) ("[C]ourts may not accept appellate counsel's post hoc rationalizations for agency action.") (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)); *Snell v. Apfel*, 177 F.3d 128, 124 (2d Cir. 1999) (applying *Burlington Truck* in a Social Security disability case)). The ALJ neither included restrictions in the RFC assessment that would reasonably address Plaintiff's allegations of incontinence, nor explained how the evidence failed to support additional restrictions in the RFC assessment to address her incontinence. Because the

ALJ did not satisfy the explanation requirement in SSR 16-3p, the undersigned recommends the court find the ALJ failed to properly consider Plaintiff's allegations of incontinence in assessing her RFC.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law.

The Fourth Circuit has explained that reversal without remand for further administrative proceedings is appropriate "where the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard," "when reopening the record for more evidence would serve no useful purpose," and where the plaintiff "presented clear and convincing proof . . . as a matter of law." *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974); *Veeney ex rel. Strother v. Sullivan*, 973 F.2d 326, 333 (4th Cir. 1992) (citing *Sahara Coal Co. v. Director, OWCP*, 946 F.2d 554, 558 (7th Cir. 1991). However, it has more recently encouraged courts to exercise caution in remanding cases for awards of benefits because "[i]f the reviewing court has no way of evaluating the basis for the ALJ's decision, then 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013).

The undersigned recommends the case be remanded because Plaintiff has not presented clear and convincing proof of her disability as a matter of law. The ALJ's decision is not supported by substantial evidence, as he failed to adequately explain how he considered Plaintiff's incontinence in assessing her RFC. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

Because the undersigned recommends the case be remanded for further administrative proceedings, Plaintiff's motion to expedite an award of benefits, [ECF No. 29], is denied.

IT IS SO RECOMMENDED.

March 18, 2026                              Shiva V. Hodges
Columbia, South Carolina                   United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

## Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).